## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

|  |  |
|---|---|
| CHRISTINA JACKSON, on behalf of her minor child, J.L., and CINDY WESTMAN, on behalf of her minor child Z.R., and on behalf of all others similarly situated,<br><br>        Plaintiffs,<br><br>    v.<br><br>PRENTKE ROMICH COMPANY d/b/a PRC-SALTILLO,<br><br>        Defendant. | Case No.: 5:24-cv-01708<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Christina Jackson, on behalf of her minor child, J.L., and Cindy Westman, on behalf of her minor child, Z.R. ("Plaintiffs") and all others similarly situated, against Defendant, Prentke Romich Company d/b/a PRC-Saltillo ("PRC" or "Defendant"), allege as follows based upon information and belief and investigation of counsel, except as to the allegations specifically pertaining to them, which are based on personal knowledge:

### NATURE OF THE ACTION

1.    This class action arises out of Defendant's negligence and failure to properly secure and safeguard approximately **51,627** Class Members' sensitive personally identifiable information ("PII") and protected health information ("PHI") (collectively, "Private Information").

2.    Defendant's data security failures allowed a targeted cyberattack to compromise Defendant's network (the "Data Breach") that, upon information and belief, contained the Private Information of Plaintiffs and other individuals ("the Class"). The Data Breach occurred on August 14, 2024, and resulted in the **theft** of Plaintiffs' and Class Members' Private Information.

3.    Defendant is a worldwide developer of speech-generating devices (SGDs), market-leading apps and several innovative AAC language systems that enable individuals with complex

communication disorders the ability to express themselves.[1]

4.    Defendant admits Plaintiffs' and Class Members' Private Information was unlawfully accessed and **stolen** in the Data Breach.

5.    Even worse, ransomware group Fog claimed responsibility for the Data Breach and posted Defendant to its dark web data leak site, confirming the theft of 250 GB worth of data.[2] Therefore, Plaintiffs have completely lost control of their Private Information and are at an imminent and substantial risk of identity theft and fraud, thus rendering mitigation costs reasonable and necessary.

6.    Considering Plaintiffs' and Class Members' Private Information was stolen by ransomware group Fog and has already been advertised for release and sale on the dark web, Plaintiffs and Class Members have suffered actual injuries and are at imminent risk of identity theft and fraud.

7.    The Private Information stolen in the Data Breach included personal or protected health information of individuals whose Private Information was maintained by Defendant, including Plaintiffs.

8.    Upon information and belief, a wide variety of Private Information was stolen in the Data Breach, including: names, phone numbers, addresses, dates of birth, treatment cost information, referring/treating physicians, health insurance policy numbers, Medicare/Medicaid plan names, and/or medical devices purchased.[3]

9.    The Data Breach was a direct result of Defendant's negligence and failure to implement adequate and reasonable cyber-security procedures and protocols necessary to protect

---

[1] https://www.prc-saltillo.com/about-us (last visited: Dec. 4, 2024).
[2] https://www.comparitech.com/news/medical-device-manufacturer-prc-saltillo-notifies-51-6k-of-data-breach-following-ransomware-attack/ (last visited: Dec 4, 2024).
[3] *See* **Exhibit 1** and **Exhibit 2**.

individuals' Private Information with which it was entrusted.

10.     Upon information and belief, the mechanism of the Data Breach and potential for improper disclosure of Plaintiffs' and Class Members' Private Information was a known risk to Defendant, and thus Defendant was on notice that failing to take adequate steps to secure the Private Information from those risks left that information in a dangerous condition.

11.     Upon information and belief, Defendant breached its duties and obligations by failing, in one or more of the following ways: (1) failing to design, implement, monitor, and maintain reasonable network safeguards against foreseeable threats; (2) failing to design, implement, and maintain reasonable data retention policies; (3) failing to adequately train staff on data security; (4) failing to comply with industry-standard data security practices; (5) failing to warn Plaintiffs and Class Members of Defendant's inadequate data security practices; (6) failing to encrypt or adequately encrypt the Private Information; (7) failing to recognize or detect that its network had been compromised and accessed in a timely manner to mitigate the harm; (8) failing to utilize widely available software able to detect and prevent this type of attack; and  (9) otherwise failing to secure the hardware using reasonable and effective data security procedures free of foreseeable vulnerabilities and data security incidents.

12.     Defendant impliedly understood its obligations and promised to safeguard Plaintiffs' and Class Members' Private Information. Plaintiffs and Class Members relied on these implied promises when seeking out and paying for Defendant's services.  But for this mutual understanding, Plaintiffs and Class Members would not have provided Defendant with their Private Information. Defendant, however, did not meet these reasonable expectations, causing Plaintiffs and Class Members to suffer injury.

13.     Defendant disregarded the rights of Plaintiffs and Class Members (defined below)

by, *inter alia*, intentionally, willfully, recklessly, and/or negligently failing to take adequate and reasonable measures to ensure its data systems were protected against unauthorized intrusions; failing to disclose that it did not have adequately robust computer systems and security practices to safeguard Plaintiffs' and Class Members' Private Information; failing to take standard and reasonably available steps to prevent the Data Breach; failing to provide Plaintiffs and Class Members with prompt and full notice of the Data Breach; and failing to inform Plaintiffs and Class Members that their Private Information was stolen by ransomware group, Fog, and has been advertised for public release and sale on the dark web.

14.     In addition, Defendant failed to adequately monitor the computer network and systems that housed the Private Information. Had it properly monitored its network, Defendant would have discovered the intrusion sooner rather than allowing cybercriminals a period of unimpeded access to the Private Information of Plaintiffs and Class Members.

15.     Plaintiffs' and Class Members' identities are now at risk because of Defendant's negligent conduct since the Private Information that Defendant collected and maintained is now in the hands of data thieves.

16.     As a result of the Data Breach, Plaintiffs and Class Members are now at a current, imminent, and ongoing risk of fraud and identity theft. Plaintiffs and Class Members must now and for years into the future closely monitor their medical and financial accounts to guard against identity theft. As a result of Defendant's unreasonable and inadequate data security practices, Plaintiffs and Class Members have suffered numerous actual and concrete injuries and damages.

17.     Plaintiffs and Class Members must now closely monitor their accounts to guard against future identity theft and fraud. Plaintiffs and Class Members have heeded such warnings to mitigate against the imminent risk of future identity theft and financial loss. Such mitigation

efforts included and will continue to include in the future, among other things: (a) researching the Data Breach; (b) researching credit monitoring and/or identity theft protection services; (c) enrolling in credit monitoring and/or identity theft protection services; (d) reviewing credit reports; (e) reviewing account statements; and (f) mitigating instances of fraud and identity theft. The loss of time and other mitigation costs are tied directly to guarding against the imminent risk of identity theft.

18.     Plaintiffs and Class Members have suffered numerous actual and concrete injuries as a direct result of the Data Breach, including: (a) financial costs incurred mitigating the materialized risk and imminent threat of identity theft; (b) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft; (c) financial costs incurred due to actual identity theft; (d) loss of time incurred due to actual identity theft; (g) deprivation in value of their Private Information; and (h) the continued risk to their sensitive Private Information, which remains in the possession of Defendant, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information it collected and maintained.

19.     Through this Consolidated Class Action Complaint, Plaintiffs seek to remedy these harms on behalf of themselves and all similarly situated individuals whose Private Information was stolen during the Data Breach.

20.     Accordingly, Plaintiffs bring this action against Defendant seeking redress for its unlawful negligent conduct and assert claims for: (i) negligence and negligence *per se*, (ii) breach of implied contract, (iii) breach of fiduciary duty, (iv) breach of confidence; (v) violation of the North Carolina Unfair and Deceptive Trade Practices Act; (vi) the Illinois Consumer Fraud and Deceptive Business Practices Act; (vii) unjust enrichment; and (viii) declaratory judgment and

injunctive relief.

21.     Plaintiffs seek remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, and injunctive relief including improvements to Defendant's data security systems, future annual audits, as well as long-term and adequate credit monitoring services funded by Defendant.

22.     The exposure of an individual's (especially a minor's) Private Information is a bell that cannot be un-rung. Before this Data Breach, Plaintiffs' and the Class's Private Information was exactly that—private. Not anymore. Now, their Private Information has been stolen by the ransomware group, Fog and posted to the group's data leak site.

## PARTIES

23.     Plaintiff Christina Jackson, on behalf of her minor child, J.L., is an adult individual who at all relevant times has been a citizen and resident of the State of North Carolina.

24.     Plaintiff Cindy Westman, on behalf of her minor child, Z.R., is an adult individual who at all relevant times has been a citizen and resident of the State of Illinois.

25.     Defendant Prentke Romich Company d/b/a PRC-Saltillo is a corporation headquartered in Wooster, Ohio and located at 1022 Heyl Road, Wooster, Ohio 44691 in Wayne County.

## JURISDICTION AND VENUE

26.     This Court has diversity jurisdiction over this action under the Class Action Fairness Act (CAFA), 28 U.S.C. § 1332(d), because this is a class action involving more than 100 class members, the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and Class Members are citizens of states that differ from Defendant, including the Plaintiffs.

27.     This Court has personal jurisdiction over Defendant because Defendant conducts business in and has sufficient minimum contacts with Ohio.

28.     Venue is likewise proper as to Defendant in this District under 28 U.S.C. § 1391(a)(1) because Defendant's principal place of business is in this District and many of Defendant's acts complained of herein occurred within this District.

## FACTUAL BACKGROUND

**A.     Defendant's Business and Collection of Plaintiffs' and Class Members' Private Information**

29.     Founded in 1966, PRC develops speech-generating devices, apps and several innovative Augmentative and Alternative Communication ("AAC") language systems designed to give individuals with complex communication disorders the ability to express themselves. Upon information and belief, PRC employs more than 247 people and generates approximately $62 million in annual revenue.

30.     As a condition of receiving communication assistance devices and services, Defendant requires that its customers entrust it with highly sensitive personal and health information. In the ordinary course of receiving services from PRC, Plaintiffs and Class Members were required to provide their Private Information to Defendant, or the Private Information of their minor children.

31.     In its Notice of Privacy Practices, PRC promises its customers, including Plaintiffs and Class Members, that "PRC-Saltillo respects your right to privacy and the security of your information." and says that it only "collects, uses and discloses your information, including PHI, in accordance with applicable law".[4] PRC also describes in its Privacy Policy the limited specific

---

[4] *See* PRC-Saltillo, Notice of Privacy Practices (effective Dec. 9, 2020), https://www.prc-saltillo.com/assets/uploads /PRC-Saltillo_Privacy_Policy_120920.pdf (last visited Nov. 24, 2024).

instances when it shares customer health information and says that it will otherwise share customers' information "only authorized by you."[5]

32.     Thus, due to the highly sensitive and personal nature of the customer information it acquires and stores, Defendant, upon information and belief, promises to, among other things: keep customers' Private Information private; comply with industry standards related to data security and the maintenance of its customers' Private Information; inform its customers of its legal duties relating to data security and comply with all federal and state laws protecting customers' Private Information; only use and release customers' Private Information for reasons that relate to the services it provides; and provide adequate notice to customers if their Private Information is disclosed without authorization.

33.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, PRC assumed legal and equitable duties it owed to them and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' Private Information from unauthorized disclosure and exfiltration.

34.     Plaintiffs and Class Members relied on PRC to keep their Private Information confidential and securely maintained and to only make authorized disclosures of this Information, which Defendant ultimately failed to do.

**B.     The Data Breach and Defendant's Inadequate Notice to Plaintiffs and Class Members**

35.     According to Defendant, between August 14, 2024 and August 21, 2024, cybercriminals had unfettered access to their computer systems resulting in the theft and compromise of Plaintiffs' and Class Members' Private Information.

---

[5] *Id.*

36.     Through the Data Breach, the cybercriminals stole a cache of Plaintiffs' and Class Members' highly sensitive Private Information, including names, addresses, phone numbers, dates of birth, treatment cost information, referring/treating physician, health insurance policy numbers, Medicare/Medicaid plan names, and/or medical devices purchased.

37.     This is made worse by the fact that, in mid-September, the ransomware group, Fog, posted to their dark web data leak site confirming the theft of Plaintiffs' and Class Members' Private Information, which includes the Private Information of minor children. Unfortunately, Plaintiffs and Class Members, including thousands of minor children, have lost control over their Private Information and will be at an imminent risk of identity theft and fraud for the rest of their lives now that their Private Information is being advertised for sale and public release on the dark web.

38.     A compounding factor here is PRC's delay in notifying victims of the Data Breach. On or about September 25, 2024—roughly one month after PRC learned that the Class's Private Information was first stolen by cybercriminals—PRC finally began to notify customers that its investigation determined that their Private Information was affected. Absent from Defendant's notice was any indication that Plaintiffs' and Class Members' Private Information was now in the hands of ransomware group, Fog, or any explanation regarding how the Data Breach occurred.[6]

39.     PRC had obligations created by contract, industry standards, common law, state laws, and representations made to Plaintiffs and Class Members to keep Plaintiffs' and Class Members' Private Information confidential and to protect it from unauthorized access and disclosure.

---

[6] *See* **Exhibits 1** and **2.**

40.     Plaintiffs and Class Members provided their Private Information to PRC with the reasonable expectation and mutual understanding that PRC would comply with its obligations to keep such Information confidential and secure from unauthorized access and to provide timely notice of any security breaches.

41.     PRC's data security obligations were particularly important given the substantial increase in cyberattacks in recent years.

42.     PRC knew or should have known that its electronic records would be targeted by cybercriminals.

**C.      Defendant Knew the Risks of Storing Valuable Private Information and the Foreseeable Harm to Victims.**

43.     At all relevant times, Defendant knew it was storing valuable and confidential Private Information on its systems and would, therefore, be an attractive target for cybercriminals.

44.     Defendant also knew that any breach of its systems, and exposure of the information stored therein, would result in the increased risk of identity theft and fraud against the individuals whose Private Information was compromised, as well as intrusion into their highly private health information.

45.     These risks are not merely theoretical; in recent years, numerous high-profile breaches have occurred at businesses such as Equifax, Yahoo, Marriott, Anthem, and many others.

46.     The Private Information stolen in the Data Breach has considerable value and constitutes an enticing and well-known target to hackers.  Hackers easily can sell stolen data as a result of the "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[7]  PHI, in addition to being of a highly personal and

---

[7]  Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/ (last visited Dec. 1, 2024).

private nature, can be used for medical fraud and to submit false medical claims for reimbursement.

47.     The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the U.S.

48.     The healthcare industry has become a prime target for threat actors: "High demand for patient information and often-outdated systems are among the nine reasons healthcare is now the biggest target for online attacks."[8]

49.     "Hospitals store an incredible amount of patient data. Confidential data that's worth a lot of money to hackers who can sell it on easily – making the industry a growing target."[9]

50.     The breadth of data compromised in the Data Breach makes the information particularly valuable to thieves and leaves Defendant's patients especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud, and more.

51.     As indicated by Jim Trainor, second in command at the FBI's cyber security division: "Medical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[10]  A complete identity theft kit that includes health insurance credentials may be worth up to $1,000 on the black market, whereas stolen payment card information sells for

---

[8]  https://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/ (last visited Dec. 1, 2024).

[9] *Id.*

[10] IDExperts, You Got It, They Want It: Criminals Targeting Your Private Healthcare Data, New Ponemon Study Shows: https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat (last visited Dec. 1, 2024).

about $1.[11]

52.   According to Experian:

Having your records stolen in a healthcare data breach can be a prescription for financial disaster. If scam artists break into healthcare networks and grab your medical information, they can impersonate you to get medical services, use your data open credit accounts, break into your bank accounts, obtain drugs illegally, and even blackmail you with sensitive personal details.

ID theft victims often have to spend money to fix problems related to having their data stolen, which averages $600 according to the FTC. But security research firm Ponemon Institute found that healthcare identity theft victims spend nearly $13,500 dealing with their hassles, which can include the cost of paying off fraudulent medical bills.

Victims of healthcare data breaches may also find themselves being denied care, coverage or reimbursement by their medical insurers, having their policies canceled or having to pay to reinstate their insurance, along with suffering damage to their credit ratings and scores. In the worst cases, they've been threatened with losing custody of their children, been charged with drug trafficking, found it hard to get hired for a job, or even been fired by their employers.[12]

53.   The "high value of medical records on the dark web has surpassed that of social security and credit card numbers. These records can **sell for up to $1,000 online.**"[13]

54.   According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the [Dark]

---

[11] PriceWaterhouseCoopers, *Managing cyber risks in an interconnected world*, Key findings from The Global State of Information Security® Survey 2015: https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf (last visited Dec. 1, 2024).

[12] Experian, Healthcare Data Breach: What to Know About them and What to Do After One: https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/ (last visited Dec. 1, 2024).

[13] https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (last visited Dec. 1, 2024).

Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[14]

55.    Even if stolen Private Information does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained Private Information about the individual, such as names, addresses, email addresses, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

56.    Here, ransomware gang Fog has already confirmed the theft of Plaintiffs' and Class Members' Private Information, and has posted PRC to its dark web data leak site. This is particularly troubling considering ransomware groups routinely release PHI to the public or sell the stolen data if their ransom demands are not met.[15] Fog's posting of PRC to its dark web data leak site and theft of Plaintiffs' and Class Members' Private Information is a clear manifestation of its intent to publicly release and sell Plaintiffs' and Class Members' Private Information. Therefore, Plaintiffs and Class Members have suffered actual injuries and are at an imminent risk of identity theft and fraud.

**D.    Defendant Failed to Comply with HIPAA**

---

[14] United States Government Accountability Office, Report to Congressional Requesters, Personal Information, June 2007: https://www.gao.gov/assets/gao-07-737.pdf (last visited Dec. 1, 2024).

[15] The Fox Group, LLC, Ransomware and HIPAA: trends and what to do, August 2, 2023: https://www.foxgrp.com/hipaa-compliance/ransomware-and-hipaa-trends-and-what-to-do/ (last visited: Dec. 1, 2024).

57.    Title II of HIPAA contains what are known as the Administration Simplification provisions. See 42 U.S.C. §§ 1301, *et seq*. These provisions require that the Department of Health and Human Services ("HHS") create rules to streamline the standards for handling PHI similar to the data Defendant left unguarded and vulnerable to attack. The HHS has subsequently promulgated five rules under authority of the Administrative Simplification provisions of HIPAA.

58.    PRC's Data Breach resulted from a combination of insufficiencies that indicate PRC failed to comply with safeguards mandated by HIPAA regulations and industry standards. First, it can be inferred from Defendant's Data Breach that PRC either failed to implement, or inadequately implemented, information security policies or procedures to protect Plaintiffs' and Class Members' PHI.

59.    Plaintiffs' and Class Members' Private Information stolen in the Data Breach included "protected health information" as defined by CFR § 160.103.

60.    45 CFR § 164.402 defines "breach" as "the acquisition, access, use, or disclosure of protected health information in a manner not permitted under subpart E of this part which compromises the security or privacy of the protected health information."

61.    45 CFR § 164.402 defines "unsecured protected health information" as "protected health information that is not rendered unusable, unreadable, or indecipherable to unauthorized persons through the use of a technology or methodology specified by the [HHS] Secretary[.]"

62.    Plaintiffs' and Class Members' Private Information included "unsecured protected health information" as defined by 45 CFR § 164.402.

63.    Plaintiffs' and Class Members' unsecured PHI was acquired, accessed, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, as a result of the Data Breach.

64.     Based upon Defendant's Notice to Plaintiffs and Class Members, PRC reasonably believes that Plaintiffs' and Class Members' unsecured PHI has been accessed, stolen, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, because of the Data Breach.

65.     Plaintiffs' and Class Members' unsecured PHI that was accessed, stolen, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E because of the Data Breach was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

66.     PRC reasonably believes that Plaintiffs' and Class Members' unsecured PHI that was accessed, stolen, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach was not rendered unusable, unreadable, or indecipherable to unauthorized persons.

67.     Plaintiffs' and Class Members' unsecured PHI that was accessed, stolen, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E because of the Data Breach, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed and stolen by unauthorized persons.

68.     Plaintiffs' and Class Members' unsecured PHI was viewed by unauthorized persons, including ransomware group, Fog, in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach.

69.     PRC reasonably believes that Plaintiffs' and Class Members' unsecured PHI was viewed and stolen by unauthorized persons in a manner not permitted under 45 CFR, Subpart E as a result of the Data Breach.

70.     It is reasonable to infer that Plaintiffs' and Class Members' unsecured PHI that was accessed, stolen, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E as a

result of the Data Breach, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons, including ransomware gang, Fog.

71.    It should be rebuttably presumed that unsecured PHI accessed, stolen, used, and/or disclosed in a manner not permitted under 45 CFR, Subpart E, and which was not rendered unusable, unreadable, or indecipherable to unauthorized persons, was viewed by unauthorized persons.

72.    After receiving notice that they were victims of the Data Breach (which required the filing of a data breach report in accordance with 45 CFR § 164.408(a)), it is reasonable for recipients of that notice, including Plaintiffs and Class Members in this case, to believe that future harm (including medical identity theft) is real and imminent, and to take steps necessary to mitigate that risk of future harm.

73.    In addition, PRC's Data Breach could have been prevented if PRC had implemented HIPAA mandated, industry standard policies and procedures for securely disposing of PHI when it was no longer necessary and/or had honored its obligations to its customers.

74.    PRC's security failures also include, but are not limited to:

   a.  Failing to maintain an adequate data security system to prevent data loss;

   b.  Failing to mitigate the risks of a data breach and loss of data;

   c.  Failing to ensure the confidentiality and integrity of electronic protected health information PRC creates, receives, maintains, and transmits in violation of 45 CFR 164.306(a)(1);

   d.  Failing to implement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only

to those persons or software programs that have been granted access rights in violation of 45 CFR 164.312(a)(1);

e.  Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 CFR 164.308(a)(1);

f.  Failing to identify and respond to suspected or known security incidents;

g.  Failing to mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 CFR 164.308(a)(6)(ii);

h.  Failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic protected health information, in violation of 45 CFR 164.306(a)(2);

i.  Failing to protect against any reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 CFR 164.306(a)(3);

j.  Failing to ensure compliance with HIPAA security standard rules by Defendant's workforce, in violation of 45 CFR 164.306(a)(94); and

k.  Impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons, in violation of 45 CFR 164.502, *et seq*.

75.  Because PRC has failed to comply with HIPAA, while monetary relief may cure some of Plaintiffs' and Class Members' injuries, injunctive relief is also necessary to ensure PRC's approach to information security is adequate and appropriate going forward. PRC still maintains the PHI and other highly sensitive Private Information of its current and former customers,

17

including Plaintiffs and Class Members. Without the supervision of the Court through injunctive relief, Plaintiffs' and Class Members' Private Information remains at risk of subsequent data breaches.

**E.      Defendant Failed to Comply with FTC Guidelines**

76.      The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision making. Indeed, the FTC has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

77.      In October 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal customer information that they keep, properly dispose of personal information that is no longer needed, encrypt information stored on computer networks, understand their network's vulnerabilities, and implement policies to correct any security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs, monitor all incoming traffic for activity indicating someone is attempting to hack into the system, watch for large amounts of data being transmitted from the system, and have a response plan ready in the event of a breach.

78.      The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction, limit access to sensitive data, require complex passwords to be used on networks, use industry-tested methods for security, monitor the network for

suspicious activity, and verify that third-party service providers have implemented reasonable security measures.

79.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer data by treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by the FTC Act. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

80.     As evidenced by the Data Breach, PRC failed to properly implement basic data security practices. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Plaintiffs' and Class Members' Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act.

81.     PRC was at all times fully aware of its obligation to protect the Private Information of its customers yet failed to comply with such obligations. Defendant was also aware of the significant repercussions that would result from its failure to do so.

**F.      Defendant Breached its Duty to Protect its Customers' Private Information**

82.     Upon information and belief, Defendant's HIPAA Privacy Policy is provided or made available to every customer both prior to receiving treatment, and upon request.[16]

83.     Defendant agreed to and undertook legal duties to maintain the protected health and personal information entrusted to it by Plaintiffs and Class Members safely, confidentially, and in compliance with all applicable laws, including the FTC Act, 15 U.S.C. § 45, and HIPAA. Under state and federal law, businesses like Defendant have duties to protect current and former patients' Private Information and to notify them about breaches.

---

[16] *See* https://www.prc-saltillo.com/privacy-policy (last visited Oct. 1, 2024).

84.     The Private Information held by Defendant in its computer system and network included the highly sensitive Private Information of Plaintiffs and Class Members.

85.     On or around August 21, 2024, Defendant detected the Data Breach on its systems. The Data Breach took place on August 14, 2024, and resulted in the theft of over 50,000 individuals' Private Information.

86.     The Data Breach occurred as a direct result of Defendant's failure to implement and follow basic security procedures, and its failure to follow its own policies, in order to protect its patients' Private Information.

**G.      Plaintiffs and Class Members Suffered Damages**

87.     For the reasons mentioned above, Defendant's conduct—which allowed the Data Breach to occur—has caused Plaintiffs and Class Members significant injuries. Considering Plaintiffs' and Class Members' Private Information was stolen by ransomware group, Fog, and has already been advertised for release and sale on the dark web, Plaintiffs and Class Members have suffered actual injuries and must immediately devote time, energy, and money to: (1) closely monitor their medical statements, bills, records, and credit and financial accounts, including those of their minor children; (2) change login and password information on any sensitive account even more frequently than they already do; (3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and (4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

88.     Once Private Information is exposed and stolen, there is virtually no way to ensure that the exposed information has been fully recovered or contained against future misuse. For this reason, Plaintiffs and Class Members will need to maintain these heightened measures for years,

and possibly their entire lives, as a result of Defendant's conduct. Further, the value of Plaintiffs' and Class Members' Private Information has been diminished by its theft in the Data Breach.

89.  Considering that the Data Breach was executed by ransomware group, Fog—and that Plaintiffs' and Class Members' Private Information has already been advertised for release and sale on the dark web—Plaintiffs and Class Members are at a substantial increased risk of suffering identity theft and fraud or misuse of Private Information.

90.  With respect to health care breaches, a study found "the majority [70%] of data impacted by healthcare breaches could be leveraged by hackers to commit fraud or identity theft."[17]

91.  "Actors buying and selling PII and PHI from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures."[18]

92.  The reality is that cybercriminals seek nefarious outcomes from a data breach" and "stolen health data can be used to carry out a variety of crimes."[19]

93.  Health information in particular is likely to be used in detrimental ways – by leveraging sensitive personal health details and diagnoses to extort or coerce someone, and serious and long-term identity theft.[20]

---

[17]  https://distilgovhealth.com/2019/10/03/70-of-data-involved-in-healthcare-breaches-increases-risk-of-fraud/ (last visited Dec. 1, 2024).

[18]  *Id.*

[19]  https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (last visited Dec. 1, 2024).

[20]  *Id.*

94.    Plaintiffs and the Class Members have been injured by Defendant's unauthorized disclosure of their confidential Private Information.

95.    Plaintiffs and Class Members are also at a continued risk because their information remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack and are subject to further attacks so long as Defendant fails to undertake the necessary and appropriate security and training measures to protect its patients' Private Information.

## COMMON INJURIES AND DAMAGES

96.    As result of Defendant's ineffective and inadequate data security practices, Plaintiffs and Class Members now face a present and ongoing risk of fraud and identity theft.

97.    Due to the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to Plaintiffs and Class Members has materialized and is imminent, and Plaintiffs and Class Members have all sustained actual injuries and damages, including but not limited to: (a) invasion of privacy; (b) "out of pocket" costs incurred mitigating the materialized risk and imminent threat of identity theft considering their Private Information was stolen by ransomware group, Fog, and has already been advertised for release and sale on the dark web; (c) loss of time and loss of productivity incurred mitigating the materialized risk and imminent threat of identity theft risk; (d) "out of pocket" costs incurred due to actual identity theft; (e) loss of time incurred due to actual identity theft; (f) loss of time due to increased spam and targeted marketing emails; (g) the loss of benefit of the bargain (price premium damages); (h) diminution of value of their Private Information; and (i) the continued risk to their Private Information, which remains in Defendant's possession, and which is subject to further breaches, so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' Private Information.

A.     **The Risk of Identity Theft to Plaintiffs and Class Members is Present and Ongoing**

98.     The link between a data breach and the risk of identity theft is simple and well established. Criminals, such as ransomware group Fog acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

99.     The imminent threat to Plaintiffs' and Class Members' Private Information underscored by Fog's double extortion tactics and inevitable posting of Plaintiffs' and Class Members' Private Information to the dark web. According to FTI Cybersecurity, "[a]s of July 16, 2024, Fog ransomware group created a dedicated blog on the dark web where the group claims it will post confidential information belonging to victim companies. As previously assessed by FTI Cybersecurity, the creation of a leak site is an indicator that FOG is employing double extortion tactics, seeking to increase payouts by threatening to publish exfiltrated data if a ransom is not paid."[21]

100.     Fog's data leak site is "a dark web data leak site to publicly shame victims who refuse to pay [the ransom], pressuring them to comply."[22] "However, this is just a deceptive tactic. Even after paying the ransom, there's no certainty that the data will be restored."[23] Fog's data leak site is only accessible through the dark web. Therefore, Fog's data leak site operates as a marketplace for cybercriminals and unauthorized parties to purchase and acquire innocent

---

[21] Threat Intelligence Report: New Fog Ransomware Leak Site Confirms Data Exfiltration and Double Extortion, FTI Consulting, available at https://fticybersecurity.com/wp-content/uploads/2024/07/FTI-Cybersecurity-Threat-Intelligence-Update-FOG-Ransomware-3.pdf (last visited: Dec. 1, 2024).
[22] Fog Ransomware – Everything You Need to Know, Red Piranha, available at: https://redpiranha.net/news/fog-ransomware-everything-you-need-know (last visited: Dec. 3, 2024).
[23] *Id*.

individuals' Private Information.

101.    Here, Fog posted PRC (Prentke Romich Company) to its dark web data leak site on September 22, 2024, indicating that it intends to publish Plaintiffs' and Class Members' Private Information to the dark web. Fog's posting of PRC to its data leak site is depicted below:[24]

> Sun, September 22, 2024
>
> **Prentke Romich Company**
>
> 250 GB
>
> read more →

102.    Therefore, considering Plaintiffs' and Class Members' Private Information was stolen by ransomware group, Fog, and has already been advertised for imminent release to the dark web, Plaintiffs and Class Members have suffered actual injuries and are at an imminent risk of identity theft and fraud.

103.    Further, because a person's identity is akin to a puzzle with multiple data points, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity – or track the victim to attempt other hacking crimes against the individual to obtain more data to perfect a crime.

104.    For example, armed with just a name and date of birth, a data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a

---

[24] Medical device manufacturer PRC-Saltillo notifies 51.6K of data breach following ransomware attack, Comparitech, available at: https://www.comparitech.com/news/medical-device-manufacturer-prc-saltillo-notifies-51-6k-of-data-breach-following-ransomware-attack/ (last visited: Dec. 1, 2024).

24

victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate and trick individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails. Data breaches are often the starting point for these additional targeted attacks on the victims.

105.     The dark web is an unindexed layer of the internet that requires special software or authentication to access.[25] Criminals in particular favor the dark web as it offers a degree of anonymity to visitors and website publishers. Unlike the traditional or 'surface' web, dark web users need to know the web address of the website they wish to visit in advance. For example, on the surface web, the CIA's web address is cia.gov, but on the dark web the CIA's web address is ciadotgov4sjwlzihbbgxnqg3xiyrg7so2r2o3lt5wz5ypk4sxyjstad.onion.[26] This prevents dark web marketplaces from being easily monitored by authorities or accessed by those not in the know.

106.     A sophisticated black market exists on the dark web where criminals can buy or sell malware, firearms, drugs, and frequently, personal and medical information like the Private Information at issue here.[27] The digital character of PII stolen in data breaches lends itself to dark web transactions because it is immediately transmissible over the internet and the buyer and seller can retain their anonymity. The sale of a firearm or drugs on the other hand requires a physical delivery address. Nefarious actors can readily purchase usernames and passwords for online streaming services, stolen financial information and account login credentials, and Social Security

---

[25] *What Is the Dark Web?*, Experian, available at https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last visited Dec. 1, 2024).

[26] *Id.*

[27] *What is the Dark Web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web (last visited Dec. 1, 2024).

numbers, dates of birth, and medical information.[28] As Microsoft warns "[t]he anonymity of the dark web lends itself well to those who would seek to do financial harm to others."[29]

107. Theft of PHI is gravely serious: "A thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[30]

108. One such example of criminals using PHI for profit is the development of "Fullz" packages. Cyber-criminals can cross-reference two sources of PHI to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

109. The development of "Fullz" packages means that stolen PHI from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, social security numbers, or credit card numbers may not be included in the information stolen by the cyber-criminals in the Data Breach, criminals can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiffs and Class Members, and it is reasonable for any trier of fact, including this Court or a

---

[28] *Id.; What Is the Dark Web?*, Experian, available at https://www.experian.com/blogs/ask-experian/what-is-the-dark-web/ (last visited Dec. 1, 2024).

[29] *What is the Dark Web?* – Microsoft 365, available at https://www.microsoft.com/en-us/microsoft-365-life-hacks/privacy-and-safety/what-is-the-dark-web (last visited Dec. 1, 2024).

[30] *See* Federal Trade Commission, Medical Identity Theft, http://www.consumer.ftc.gov/articles/0171-medical-identity-theft (last visited Dec. 1, 2024).

jury, to find that Plaintiffs' and Class Members' stolen PHI is being misused, and that such misuse is fairly traceable to the Data Breach.

110.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.[31]

111.    Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good."[32] Defendant did not rapidly report to Plaintiffs and the Class that their Private Information had been stolen.

112.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

113.    In addition to out-of-pocket expenses that can exceed thousands of dollars, and the emotional toll identity theft can take, some victims must spend a considerable time repairing the damage caused by the theft of their Private Information. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

114.    Such mitigation efforts are particularly warranted where, as here, Plaintiffs' and Class Members' Private Information has already been stolen and advertised for sale and release to the dark web by cybercriminals

115.    Further complicating the issues faced by victims of identity theft, data thieves may

---

[31] *See* https://www.fbi.gov/news/stories/2019-internet-crime-report-released-021120 (last visited Dec. 1, 2024).

[32] *Id.*

wait years before attempting to use the stolen Private Information. To protect themselves, Plaintiffs and Class Members will need to remain vigilant against unauthorized data use for years or even decades to come.

116.    The Federal Trade Commission ("FTC") has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency. The larger the data set, the greater potential for analysis and profit."[33]

117.    The FTC has also issued numerous guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making. According to the FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; (5) using industry-tested and accepted methods for securing data; (6) monitoring activity on networks to uncover unapproved activity; (7) verifying that privacy and security features function properly; (8) testing for common vulnerabilities; and (9) updating and patching third-party software.[34]

118.    According to the FTC, unauthorized PHI disclosures are extremely damaging to consumers' finances, credit history and reputation, and can take time, money and patience to resolve the fallout. The FTC treats the failure to employ reasonable and appropriate measures to

---

[33] Statement of FTC Commissioner Pamela Jones Harbour (Remarks Before FTC Exploring Privacy Roundtable), http://www.ftc.gov/speeches/harbour/091207privacyroundtable.pdf (last visited Dec. 1, 2024).

[34] *See generally* https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business (last visited Dec. 1, 2024).

protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTC Act.[35]

119.    Defendant's failure to notify Plaintiffs and Class Members of the Data Breach exacerbated Plaintiffs' and Class Members' injury by depriving them of the earliest ability to take appropriate measures to protect their Private Information and take other necessary steps to mitigate the harm caused by the Data Breach.

**B.      Loss of Time to Mitigate the Risk of Identify Theft and Fraud**

120.    As a result of the recognized risk of identity theft, when a data breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

121.    Such efforts are even more necessary where, as here, a ransomware group has confirmed the theft of Plaintiffs' and Class Members' Private Information and has already advertised Plaintiffs' and Class Members' Private Information for release and sale to its data leak site.

122.    Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as placing "freezes" and "alerts" with credit reporting agencies, contacting financial institutions, closing or modifying financial accounts, changing

---

[35]    *See, e.g.*, https://www.ftc.gov/news-events/news/press-releases/2016/07/commission-finds-labmd-liable-unfair-data-security-practices (last visited Dec. 1, 2024).

passwords, reviewing and monitoring credit reports and accounts for unauthorized activity, and filing police reports, which may take years to discover and detect.

123.    In the event that Plaintiffs and Class Members experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[36] Indeed, the FTC recommends that identity theft victims take several steps and spend time to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[37]

## C.    Diminution in Value of the Private Information

124.    PII and PHI is a valuable property right.[38] Its value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

125.    For example, drug manufacturers, medical device manufacturers, pharmacies, hospitals and other healthcare service providers often purchase Private Information on the black

---

[36] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf ("GAO Report") (last visited Dec. 1, 2024).

[37] *See* https://www.identitytheft.gov/Steps (last visited Dec. 1, 2024).

[38] *See, e.g.*, John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("PII, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

market for the purpose of target-marketing their products and services to the physical maladies of the data breach victims themselves. Insurance companies purchase and use wrongfully disclosed PHI to adjust their insureds' medical insurance premiums.

126.    Private Information can sell for as much as $363 per record according to the Infosec Institute.[39]

127.    Medical information is especially valuable to identity thieves. According to account monitoring company LogDog, medical data was selling on the dark web for $50 and up.[40]

128.    An active and robust legitimate marketplace for Private Information also exists. In 2019, the data brokering industry was worth roughly $200 billion.[41] In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and provides it to marketers or app developers.[42, 43] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50 a year.[44]

129.    In fact, in this case, ransomware group, Fog, is preparing to engage the dark web market by advertising Private Information stolen in the Data Breach for sale on its dark web data leak site.

---

[39] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/ (last visited Dec. 1, 2024).

[40] *See* https://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/#content (last visited Dec. 1, 2024).

[41] *See* https://www.latimes.com/business/story/2019-11-05/column-data-brokers (last visited Dec. 1, 2024).

[42] *See* https://datacoup.com/ (last visited Dec. 1, 2024).

[43] *See* https://digi.me/what-is-digime/ (last visited Dec. 1, 2024).

[44] Nielsen Computer & Mobile Panel, Frequently Asked Questions, available at https://computermobilepanel.nielsen.com/ui/US/en/faqen.html (last visited Dec. 1, 2024).

130.     As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished in its value by its unauthorized and imminent release onto the dark web, where it may soon be available and holds significant value for the threat actors.

**D.      Future Cost of Credit and Identify Theft Monitoring is Reasonable and Necessary**

131.     To date, Defendant has **nothing** to provide Plaintiffs and Class Members with relief for the damage they have suffered as a result of the Data Breach. Defendant places the burden on remedying the Data Breach completely on the Plaintiffs and Class Members by stating: "[s]hould you feel that steps need to be taken, we have provided a list of free resources in the enclosed *Steps You Can Take to Protect Your Minor's Information* for additional information and resources."[45]

132.     Given the type of targeted attack in this case and sophisticated criminal activity conducted by Fog,  the type of Private Information, and the *modus operandi* of ransomware groups (including Fog), there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes – *e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

133.     This is particularly concerning in this case, as the ransomware group Fog has already posted and publicly advertised the sale and release of Plaintiffs' and Class Members' private information by uploading the PRC to its data leak site.

134.     Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Private Information was used to file for

---

[45] *See* **Exhibits 1 and 2**.

unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

135.    Furthermore, the information stolen in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach, where victims can easily cancel or close credit and debit card accounts.[46] The information disclosed in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

136.    Consequently, Plaintiffs and Class Members are at a present and ongoing risk of fraud and identity theft for many years into the future.

137.    The retail cost of credit monitoring and identity theft monitoring can cost $200 or more a year per Class Member. This is a reasonable and necessary cost to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach. This is a future cost for a minimum of five years that Plaintiffs and Class Members would not need to bear but for Defendant's failure to safeguard their Private Information.

**E.      Loss of Benefit of the Bargain**

138.    Furthermore, Defendant's poor data security deprived Plaintiffs and Class Members of the benefit of their bargain. When agreeing to provide their Private Information, which was a condition precedent to obtain services, and paying Defendant for its services, Plaintiffs as consumers understood and expected that they were, in part, paying for services and data security to protect their minor children's Private Information required to be collected.

---

[46] *See* Jesse Damiani, *Your Social Security Number Costs $4 On The Dark Web, New Report Finds*, FORBES (Mar. 25, 2020), https://www.forbes.com/sites/jessedamiani/2020/03/25/your-social-security-number-costs-4-on-the-dark-web-new-report-finds/?sh=6a44b6d513f1 (last visited Dec. 2, 2024).

139. In fact, Defendant did not provide the expected data security. Accordingly, Plaintiffs and Class Members received services that were of a lesser value than what they reasonably expected to receive under the bargains struck with Defendant.

**F.** **Injunctive Relief is Necessary to Protect Against Future Data Breaches**

140. Moreover, Plaintiffs and Class Members have an interest in ensuring that Private Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing Private Information is not accessible online and that access to such data is password protected.

141. Because of Defendant's failure to prevent the Data Breach, Plaintiffs and Class Members suffered—and will continue to suffer—damages. These damages include, *inter alia*, monetary losses, the theft Plaintiffs' and Class Members' Private Information by ransomware group, Fog, lost time spent mitigating the harmful effects of the Data Breach, loss of the benefit of the bargain, and diminution of value in Plaintiffs' and Class Members' Private Information. Also, Plaintiffs and Class Members suffered or are at an increased risk of suffering:

a. loss of the opportunity to control how their Private Information is used;

b. compromise and continuing publication of their Private Information to the dark web;

c. out-of-pocket costs from trying to prevent, detect, and recover from identity theft and fraud;

d. lost opportunity costs and wages from spending time trying to mitigate the fallout of the Data Breach by, *inter alia*, preventing, detecting, contesting, and recovering from identify theft and fraud;

e.      delay in receipt of tax refund monies;

f.      unauthorized use of their stolen Private Information; and

g.      continued risk to their Private Information —which remains in Defendant's possession—and is thus at risk for futures breaches so long as Defendant fails to take appropriate measures to protect the Private Information.

## G.      Lack of Compensation

142.    Defendant fails to compensate victims of the Data Breach at all, who commonly face multiple years of ongoing identity theft, and it entirely fails to provide any compensation for its unauthorized release and disclosure of Plaintiffs' and Class Members' Private Information, out of pocket costs, and the time they are required to spend attempting to mitigate their injuries.

143.    Plaintiffs and Class Members have been damaged by the compromise and exfiltration by ransomware group, Fog, of their Private Information in the Data Breach, and by the severe disruption to their lives as a direct and foreseeable consequence of this Data Breach.

144.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have been placed at an actual, imminent, and substantial risk of harm from fraud and identity theft.

145.    Further, Plaintiffs and Class Members have been forced to expend time dealing with the effects of the Data Breach and face a substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft. Plaintiffs and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

146.    Specifically, many victims suffered ascertainable losses in the form of out-of-

pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach relating to:

      a.      Finding fraudulent charges;

      b.      Canceling and reissuing credit and debit cards;

      c.      Purchasing credit monitoring and identity theft prevention;

      d.      Monitoring their medical records for fraudulent charges and data;

      e.      Addressing their inability to withdraw funds linked to compromised accounts;

      f.      Taking trips to banks and waiting in line to obtain funds held in limited accounts;

      g.      Placing "freezes" and "alerts" with credit reporting agencies;

      h.      Spending time on the phone with or at a financial institution to dispute fraudulent charges;

      i.      Contacting financial institutions and closing or modifying financial accounts;

      j.      Resetting automatic billing and payment instructions from compromised credit and debit cards to new ones;

      k.      Paying late fees and declined payment fees imposed as a result of failed automatic payments that were tied to compromised cards that had to be cancelled; and

      l.      Closely reviewing and monitoring bank accounts and credit reports for unauthorized activity for years to come.

147.    In addition, Plaintiffs and Class Members also suffered a loss of value of their Private Information when it was acquired by ransomware group, Fog, in the Data Breach. Even

worse, Fog has already posted and publicly advertised the sale and release of Plaintiffs' and Class Members' Private Information by uploading PRC to its dark web data leak site. Numerous courts have recognized the property of loss of value damages in related cases.

148. Plaintiffs and Class Members are forced to live with the anxiety that their Private Information—which contains the most intimate details about a person's life—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

149. Defendant's delay in identifying and reporting the Data Breach caused additional harm. In a data breach, time is of the essence to reduce the imminent misuse of Private Information. Early notification helps a victim of a Data Breach mitigate their injuries, and in the converse, delayed notification causes more harm and increases the risk of identity theft. Here, Defendant waited over a month to notify Plaintiffs and Class Members of the Data Breach. Defendant has yet to offer an explanation for the delay. This delay violates HIPAA and other notification requirements and increases the injuries to Plaintiffs and Class.

### PLAINTIFF CHRISTINA JACKSON'S AND J.L.'S EXPERIENCE

150. Plaintiff Christina Jackson, on behalf of her minor child, J.L., is and at all times mentioned herein, an adult individual and a natural person residing in Raleigh, North Carolina, where she intends to remain.

151. Plaintiff Jackson provided her minor child's Private Information to Defendant as a customer at PRC.

152. Plaintiff received a notice letter, on behalf of her minor child, J.L, from Defendant in September of 2024 informing her of the Data Breach and the exposure of her minor child's Private Information.

153. The notice letter informed Plaintiff that her minor child's Private Information was stolen in the Data Breach.

154. Plaintiff only allowed Defendant to maintain, store, and use J.L.'s Private Information because she believed that Defendant would use at least basic security measures to protect her minor child's Private Information, such as requiring passwords and multi-factor authentication to access databases that stored her minor child's Private Information. As a result, J.L.'s Private Information was within the possession and control of Defendant at the time of the Data Breach.

155. Plaintiff Jackson is now aware that cybercriminals often sell Private Information, and once stolen, it is likely to be abused months or even years after Defendant's Data Breach.

156. Plaintiff entrusted her minor child's Private Information and other confidential information to Defendant with the reasonable expectation and understanding that Defendant or its agents, would take industry-standard precautions to protect, maintain, and safeguard that information from unauthorized users or disclosure, and would timely notify her of any data security incidents related to her minor child's Private Information.

157. Plaintiff would not have allowed Defendant to collect and maintain her minor child's Private Information had she known that Defendant would not take reasonable steps to safeguard her minor child's Private Information.

158. In the instant that her minor child's Private Information was accessed and obtained by a third party without her or her minor child's consent or authorization, Plaintiff Jackson's minor child, J.L., suffered injury from a loss of privacy. This is particularly true considering ransomware group, Fog, maintains possession of J.L.'s Private Information and has publicly advertised for its sale and public release.

159.    Plaintiff Jackson's minor child has been further injured by the damages to and diminution in value of her minor child's Private Information—a form of intangible property that Plaintiff Jackson entrusted to Defendant. This information has inherent value that Plaintiff's minor child was deprived of when her Private Information was placed on a publicly accessible database, exfiltrated by cybercriminals, and, upon information and belief, will be placed for sale on the dark web.

160.    The Data Breach has also caused Plaintiff to suffer imminent and impending injury in the form of substantially increased risk of additional future fraud, identity theft, and misuse resulting from her minor child's Private Information being placed in the hands of criminals. Ransomware group, Fog, has already posted and publicly advertised the sale and release of Plaintiffs' and Class Members' Private Information by uploading PRC to its data leak site. Therefore, considering Fog has possession and is threatening the sale and release of Plaintiff Jackson's minor child's Private Information, Plaintiff Jackson's minor child, J.L., is at a substantially increased risk of identity theft, fraud, and further misuse.

161.    As a result of the actual harm suffered and the increased imminent risk of future harm, Plaintiff Jackson has spent time and effort checking her minor child's accounts, researching the Data Breach, researching credit monitoring and/or identity theft protection services, enrolling her minor child in credit monitoring and identity theft protection services, reviewing credit reports, and otherwise mitigating the harmful effects of the Data Breach.

162.    In addition, Plaintiff Jackson, on behalf of her minor child, has spent significant time dealing with issues related to the Data Breach, including time spent verifying the legitimacy of the Data Breach Notice Letter and self-monitoring her own accounts and credit reports to ensure no fraudulent activity has occurred. This time, which has been lost forever and cannot be

recaptured, was incurred as a result of the Data Breach.

163.    The substantial risk of imminent harm and loss of privacy have both caused Plaintiff and her minor child to suffer stress, fear, and anxiety, especially the indefinite prospect of Plaintiff Jackson's minor child's Private Information being available to third parties for the rest of her minor child's life.

164.    Plaintiff Jackson has a continuing interest in ensuring that her minor child's Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

**PLAINTIFF CINDY WESTMAN'S AND Z.R.'S EXPERIENCE**

165.    Plaintiff Cindy Westman, on behalf of her minor child, Z.R., is and at all times mentioned herein, an adult individual and a natural person residing in the State of Illinois, where she intends to remain.

166.    Plaintiff Westman provided her minor child's Private Information to Defendant as customers at PRC.

167.    Plaintiff Westman received a notice letter, on behalf of her minor child, Z.R., from Defendant in September 2024 informing her of the Data Breach and the exposure of her minor child's Private Information.

168.    The notice letter informed Plaintiff Westman that her minor child's Private Information was stolen in the Data Breach.

169.    Plaintiff only allowed Defendant to maintain, store, and use her minor child's Private Information because she believed that Defendant would use at least basic security measures to protect Z.R.'s Private Information, such as requiring passwords and multi-factor authentication to access databases that stored her minor child's Private Information. As a result, Z.R.'s Private

Information was within the possession and control of Defendant at the time of the Data Breach.

170.    Plaintiff Westman is aware that cybercriminals often sell Private Information, and once stolen, it is likely to be abused months or even years after Defendant's Data Breach.

171.    Plaintiff Westman entrusted her minor child's Private Information and other confidential information to Defendant with the reasonable expectation and understanding that Defendant or its agents, would take industry-standard precautions to protect, maintain, and safeguard that information from unauthorized users or disclosure, and would timely notify her of any data security incidents related to her minor child's Private Information.

172.    Plaintiff Westman would not have allowed Defendant to collect and maintain Z.R.'s Private Information had she known that Defendant would not take reasonable steps to safeguard her minor child's Private Information.

173.    In the instant that her minor child's Private Information was stolen by a third party without her or Z.R.'s consent or authorization, Plaintiff Westman's minor child suffered injury from a loss of privacy. This is particularly true considering that ransomware group Fog now controls Z.R.'s Private Information and has publicly advertised its sale and public release.

174.    Plaintiff Westman's minor child has been further injured by the damages to and diminution in value of their Private Information—a form of intangible property that Plaintiff Westman entrusted to Defendant on behalf of Z.R. This information has inherent value that Plaintiff Westman's minor child was deprived of when her Private Information was placed on a publicly accessible database, exfiltrated by cybercriminals, and, upon information and belief, will be placed for sale on the dark web.

175.    The Data Breach has also caused Plaintiff Westman's minor child to suffer imminent and impending injury in the form of substantially increased risk of additional future

fraud, identity theft, and misuse resulting from her minor child's Private Information being placed in the hands of criminals. Ransomware group, Fog, has already posted and publicly advertised the sale and release of Plaintiffs' and Class Members' Private Information by uploading PRC to its data leak site. Therefore, considering Fog has possession and is threatening the sale and release of Plaintiff Westman's minor child's Private Information, Z.R. is at a substantially increased risk of identity theft, fraud, and further misuse.

176.    As a result of the actual harm suffered and the increased imminent risk of future harm, Plaintiff Westman has spent time and effort checking her minor child's accounts, researching the Data Breach, researching credit monitoring and/or identity theft protection services, enrolling her minor child in credit monitoring and identity theft protection services, reviewing credit reports, and otherwise mitigating the harmful effects of the Data Breach.

177.    In addition, Plaintiff Westman, on behalf of her minor child, has spent significant time dealing with issues related to the Data Breach, including time spent verifying the legitimacy of the Data Breach Notice Letter and self-monitoring her own accounts and credit reports to ensure no fraudulent activity has occurred. This time, which has been lost forever and cannot be recaptured, was incurred because of the Data Breach.

178.    The substantial risk of imminent harm and loss of privacy have both caused Plaintiff Westman and her minor child to suffer stress, fear, and anxiety, especially the indefinite prospect of Plaintiff Westman's minor child's Private Information being available to third parties for the rest of her minor child's life.

179.    Plaintiff Westman has a continuing interest in ensuring that her minor child's Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ALLEGATIONS

180.    Plaintiffs bring this case individually and, pursuant to Federal Rule of Civil Procedure 23, on behalf of the following Nationwide Class and State Subclasses (collectively referred to herein as the "Class"), subject to amendment as appropriate:

### Nationwide Class

All individuals in the United States whose Private Information was compromised in the Defendant's Data Breach, which occurred on August 14, 2024.

### North Carolina Subclass

All residents of North Carolina whose Private Information was compromised in the Defendant's Data Breach, which occurred on August 14, 2024.

### Illinois Subclass

All residents of Illinois whose Private Information was compromised in the Defendant's Data Breach, which occurred on August 14, 2024.

181.    Excluded from the Class is Defendant, its subsidiaries and affiliates, its officers, directors and members of their immediate families and any entity in which Defendant has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

182.    Plaintiffs reserve the right to modify or amend the definition of the proposed Class prior to moving for class certification.

183.    **Numerosity.**   The class described above is so numerous that joinder of all individual members in one action would be impracticable.  The disposition of the individual claims of the respective Class Members through this class action will benefit both the parties and this Court. It is believed the class size consists of approximately **51,627** class members. The exact size

of the Class and the identities of the individual members thereof are ascertainable through Defendant's records, including but not limited to, the files implicated in the Data Breach.

184.    **Commonality.**  This action involves questions of law and fact that are common to the Class Members. Such common questions include, but are not limited to:

      a.    Whether Defendant had a duty to protect the Private Information of Plaintiffs and Class Members;

      b.    Whether Defendant had a duty to maintain the confidentiality of Plaintiffs' and Class Members' Private Information;

      c.    Whether Defendant breached its obligation to maintain Plaintiffs' and the Class Members' medical information in confidence;

      d.    Whether Defendant was negligent in collecting, storing and safeguarding Plaintiffs' and Class Members' Private Information, and breached its duties thereby;

      e.    Whether Defendant breached its fiduciary duty to Plaintiffs and the Class;

      f.    Whether Plaintiffs and Class Members are entitled to damages as a result of Defendant's wrongful conduct;

      g.    Whether Plaintiffs and Class Members are entitled to restitution or disgorgement as a result of Defendant's wrongful conduct; and

      h.    Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

185.    **Typicality**.  Plaintiffs' claims are typical of the claims of the Class Members.  The claims of the Plaintiffs and members of the Class are based on the same legal theories and arise from the same failure by Defendant to safeguard Private Information.   Plaintiffs and Class

Members were all customers of Defendant, each having their Private Information obtained by an unauthorized third party.

186.  **Adequacy of Representation.**  Plaintiffs, on behalf of their minor children, J.L. and Z.R., are adequate representatives of the Class because their minor children's interests do not conflict with the interests of the other Class Members they seek to represent; Plaintiffs have retained counsel competent and experienced in complex class action litigation; Plaintiffs intend to prosecute this action vigorously; and Plaintiffs' counsel has adequate financial means to vigorously pursue this action and ensure the interests of the Class will not be harmed.  Furthermore, the interests of the Class Members will be fairly and adequately protected and represented by Plaintiffs and Plaintiffs' counsel.

187.  **Predominance.**  Common questions of law and fact predominate over any questions affecting only individual Class Members. For example, Defendant's liability and the fact of damages is common to Plaintiffs and each member of the Class. If Defendant breached its common law and statutory duties to secure Private Information on its network server, then Plaintiffs and each Class Member suffered damages from the exposure of sensitive Private Information in the Data Breach.

188.  **Superiority.** Given the relatively low amount recoverable by each Class Member, the expenses of individual litigation are insufficient to support or justify individual suits, making this action superior to individual actions.

189.  **Manageability.** The precise size of the Class is unknown without the disclosure of Defendant's records.  The claims of Plaintiffs and the Class Members are substantially identical as explained above. Certifying the case as a class action will centralize these substantially identical

claims in a single proceeding and adjudicating these substantially identical claims at one time is the most manageable litigation method available to Plaintiffs and the Class.

**FIRST CAUSE OF ACTION**
**NEGLIGENCE AND NEGLIGENCE *PER SE***
**(On Behalf of Plaintiffs and the Class)**

190.     Plaintiffs restate and reallege all proceeding allegations above as if fully set forth herein.

191.     Defendant owed Plaintiffs and Class Members a common law duty to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting their Private Information in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

192.     Defendant's duty to use reasonable care arose from several sources, including but not limited to, those described below.

193.     Defendant had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of Defendant. By collecting and storing Private Information that is routinely targeted by criminals for unauthorized access, Defendant was obligated to act with reasonable care to protect against these foreseeable threats.

194.     Defendant's duty to employ reasonable data security measures arose, in part, under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

195.     Further, Pursuant to HIPAA, 42 U.S.C. § 1302(d), *et seq.*, Defendant had a duty to implement reasonable safeguards to protect Plaintiffs' and Class Members' Private Information.

196.     Defendant's duty also arose because Defendant was bound by industry standards to protect its customers' confidential Private Information.

197.     Specifically, pursuant to HIPAA, Defendant had a duty to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without the use of a confidential process or key." *See* definition of "encryption" at 45 C.F.R. § 164.304.

198.     Defendant's duty also arose due to its special relationship with Plaintiffs and Class Members. Defendant had a special relationship with Plaintiffs and Class Members. Plaintiffs' and Class Members' willingness to entrust Defendant with their Private Information was predicated on the understanding that Defendant would take adequate security precautions. Moreover, only Defendant had the ability to protect its systems (and the Private Information that it stored on them) from attack.

199.     Defendant breached the duties owed to Plaintiffs and Class Members and thus was negligent. Defendant breached these duties by, among other things: (a) mismanaging its systems and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and theft of Private Information; (b) allowing cybercriminals, including Fog, to steal Plaintiffs' and Class Members' Private Information; (c) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (d) failing to design and implement information safeguards to control these risks; (e) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (f) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (g) failing to

detect the Data Breach at the time it began or within a reasonable time thereafter; and (h) failing to follow its own privacy policies and practices published to its customers.

200.    Further, Defendant breached its duties to Plaintiffs and Class Members under the FTC Act and HIPAA by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information. Defendant also violated the FTC Act and HIPAA by failing to use reasonable measures to protect the Private Information of Plaintiffs and the Class and by not complying with applicable industry standards, as described herein.

201.    But for Defendant's wrongful and negligent breach of its duties owed to Plaintiffs and Class Members, their Private Information would not have been stolen and advertised for public release and sale to the dark web by ransomware group, Fog.

202.    Section 5 of the FTC Act prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by entities such as Defendant or failing to use reasonable measures to protect PII and PHI. Various FTC publications and orders also form the basis of Defendant's duty.

203.    Defendant violated Section 5 of the FTC Act by failing to use reasonable measures to protect the Private Information and not complying with the industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of a data breach involving the Private Information of its customers.

204.    Plaintiffs and Class Members are within the class of persons that the FTC Act and HIPAA are intended to protect and Defendant's failure to comply with both constitutes negligence *per se*.

205. The harm that has occurred because of Defendant's conduct is the type of harm that the FTC Act and HIPAA were intended to guard against.

206. Defendant violated its own policies not to use or disclose Private Information without written authorization.

207. Defendant violated its own policies by actively disclosing Plaintiffs' and the Class Members' Private Information; by failing to provide fair, reasonable, or adequate computer systems and data security practices to safeguard Plaintiffs' and Class Members' Private Information; failing to maintain the confidentiality of Plaintiffs' and the Class Members' records; and by failing to provide timely notice of the breach of Private Information to Plaintiffs and the Class.

208. As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have suffered injuries, including:

     a. Theft of their Private Information by ransomware group, Fog;

     b. The advertisement by the ransomware group Fog for the release and sale of their Private Information to the dark web;

     c. Lost time spent remedying the harmful effects of the Data Breach, including checking their minor children's accounts, researching the Data Breach, researching credit monitoring and/or identity theft protection services, enrolling their minor children in credit monitoring and identity theft protection services, reviewing credit reports, and otherwise mitigating the harmful effects of the Data Breach;

     d. Costs associated with the detection and prevention of identity theft and unauthorized use of the financial accounts;

e.      Costs associated with purchasing credit monitoring and identity theft protection services;

f.      Lowered credit scores resulting from credit inquiries following fraudulent activities;

g.      Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Defendant's Data Breach – including finding fraudulent charges, cancelling and reissuing cards, enrolling in credit monitoring and identity theft protection services, freezing and unfreezing accounts, and imposing withdrawal and purchase limits on compromised accounts;

h.      The imminent and certainly impending injury flowing from the increased risk of potential fraud and identity theft posed by their Private Information being placed in the hands of criminals;

i.      Damages to and diminution in value of their Private Information entrusted, directly or indirectly, to Defendant with the mutual understanding that Defendant would safeguard Plaintiffs' and Class Members' data against theft and not allow access and misuse of their data by others;

j.      Continued risk of exposure to hackers and thieves of their Private Information, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs' and Class Members' data;

k.      Loss of their privacy and confidentiality in their Private Information;

l.    The erosion of the essential and confidential relationship between Defendant and Plaintiffs and Class Members as customers; and

m.    Loss of personal time spent carefully reviewing statements from health insurers and providers to check for charges for services not received.

209.    As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and nominal damages, in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs and the Class)**

210.    Plaintiffs restate and reallege all proceeding allegations above as if fully set forth herein.

211.    Defendant provides communication assistance devices to Plaintiffs and Class Members. Plaintiffs and Class Members formed an implied contract with Defendant regarding the provision of those services through their collective conduct, including by Plaintiffs and Class Members paying for services and/or entrusting their valuable Private Information to Defendant in exchange for such services.

212.    Through Defendant's sale of products and services to Plaintiffs and Class Members, it knew or should have known that it must protect Plaintiffs' and Class Members' confidential Private Information in accordance with its policies, practices, and applicable law.

213.    As consideration, Plaintiffs and Class Members paid money to Defendant and/or turned over valuable Private Information to PRC. Accordingly, Plaintiffs and Class Members bargained with Defendant to securely maintain and store their Private Information.

214.     Defendant accepted payment and/or possession of Plaintiffs' and Class Members' Private Information for the purpose of providing devices and services to Plaintiffs and Class Members.

215.     In paying Defendant and/or providing their valuable Private Information to Defendant in exchange for Defendant's devices and services, Plaintiffs and Class Members intended and understood that PRC would adequately safeguard the Private Information as part of those services.

216.     Defendant's implied promises to Plaintiffs and Class Members include, but are not limited to: (1) taking steps to ensure that anyone who is granted access to Private Information also protect the confidentiality of that data; (2) taking steps to ensure that the Private Information that is placed in the control of its employees is restricted and limited to achieve an authorized business purpose; (3) restricting access to qualified and trained employees and/or agents; (4) designing and implementing appropriate retention policies to protect the Private Information against criminal data breaches; (5) applying or requiring proper encryption; (6) implementing multifactor authentication for access; (7) complying with HIPAA standards to make sure that Plaintiffs' and Class Members' PHI would remain protected; and (8) taking other steps to protect against foreseeable data breaches.

217.     Plaintiffs and Class Members would not have entrusted their Private Information to PRC in the absence of such an implied contract.

218.     Had Defendant disclosed to Plaintiffs and the Class that it did not have adequate computer systems and security practices to secure sensitive data, Plaintiffs and Class Members would not have provided their Private Information to PRC.

219.    As a provider of healthcare related devices and services, Defendant recognized (or should have recognized) that Plaintiffs' and Class Member's Private Information is highly sensitive and must be protected, and that this protection was of material importance as part of the bargain with Plaintiffs and the other Class Members.

220.    Defendant violated these implied contracts by failing to employ reasonable and adequate security measures to secure Plaintiffs' and Class Members' Private Information. PRC further breached these implied contracts by failing to comply with its promise to abide by HIPAA.

221.    Additionally, Defendant breached the implied contracts with Plaintiffs and Class Members by failing to ensure the confidentiality and integrity of electronic protected health information it created, received, maintained, and transmitted, in violation of 45 CFR 164.306(a)(1).

222.    Defendant also breached the implied contracts with Plaintiffs and Class Members by failing to implement technical policies and procedures for electronic systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights, in violation of 45 CFR 164.312(a)(1).

223.    Defendant further breached the implied contracts with Plaintiffs and Class Members by failing to implement policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 CFR 164.308(a)(1).

224.    Defendant further breached the implied contracts with Plaintiffs and Class Members by failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 CFR 164.308(a)(6)(ii).

225.    Defendant further breached the implied contracts with Plaintiffs and Class Members by failing to protect against any reasonably anticipated threats or hazards to the security or integrity of electronic protected health information, in violation of 45 CFR 164.306(a)(2).

226.    Defendant further breached the implied contracts with Plaintiffs and Class Members by failing to protect against any reasonably anticipated uses or disclosures of electronic protected health information that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 CFR 164.306(a)(3).

227.    Defendant further breached the implied contracts with Plaintiffs and Class Members by failing to ensure compliance with the HIPAA security standard rules by its workforce violations, in violation of 45 CFR 164.306(a)(4).

228.    Defendant further breached the implied contracts with Plaintiffs and Class Members by impermissibly and improperly using and disclosing protected health information that is and remains accessible to unauthorized persons, in violation of 45 CFR 164.502, *et seq.*

229.    Defendant further breached the implied contracts with Plaintiffs and Class Members by failing to design, implement, and enforce policies and procedures establishing physical administrative safeguards to reasonably safeguard protected health information, in violation of 45 CFR 164.530(c).

230.    Defendant further breached the implied contracts with Plaintiffs and Class Members by otherwise failing to safeguard Plaintiffs' and Class Members' PHI.

231.    A meeting of the minds occurred, as Plaintiffs and Class Members agreed, *inter alia*, to provide payment and/or accurate and complete Private Information to Defendant in exchange for PRC's agreement to, *inter alia*, provide services that included protection of their highly sensitive Private Information.

232.    Plaintiffs and Class Members have been damaged by Defendant's conduct, including the harms and injuries arising from the Data Breach now and in the future, as alleged herein, including the theft of their Private Information by Fog and subsequent advertisement of their Private Information for public release and sale to the dark web.

### THIRD CAUSE OF ACTION
### BREACH OF FIDUCIARY DUTY
### (On Behalf of Plaintiffs and the Class)

233.    Plaintiffs restate and reallege all proceeding allegations above as if fully set forth herein.

234.    In light of the special relationship between Defendant and its customers, whereby PRC became a guardian of Plaintiffs' and Class Members' Private Information (including highly sensitive, confidential, personal, and other PHI) PRC was a fiduciary, created by its undertaking and guardianship of the Private Information, to act primarily for the benefit of its customers, including Plaintiffs and Class Members. This benefit included (1) the safeguarding of Plaintiffs' and Class Members' Private Information; (2) timely notifying Plaintiffs and Class Members of the Data Breach; and (3) maintaining complete and accurate records of what and where PRC's customers' Private Information was and is stored.

235.    Defendant had a fiduciary duty to act for the benefit of Plaintiffs and the Class upon matters within the scope of its customers' relationship, in particular to keep the Private Information secure.

236.    Defendant breached its fiduciary duties to Plaintiffs and the Class by (a) mismanaging its systems and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and theft of Private Information; (b) allowing cybercriminals, including Fog,

to steal Plaintiffs' and Class Members' Private Information; (c) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (d) failing to design and implement information safeguards to control these risks; (e) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems, and procedures; (f) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (g) failing to detect the Data Breach at the time it began or within a reasonable time thereafter; and (h) failing to follow its own privacy policies and practices published to its customers.

237.   PRC breached its fiduciary duties to Plaintiffs and Class Members by failing to ensure the confidentiality and integrity of electronic PHI PRC created, received, maintained, and transmitted, in violation of 45 CFR 164.306(a)(1).

238.   Defendant breached its fiduciary duties to Plaintiffs and Class Members by failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights, in violation of 45 CFR 164.312(a)(1).

239.   Defendant breached its fiduciary duties to Plaintiffs and Class Members by failing to implement policies and procedures to prevent, detect, contain, and correct security violations, in violation of 45 CFR 164.308(a)(1).

240.   Defendant breached its fiduciary duties to Plaintiffs and Class Members by failing to identify and respond to suspected or known security incidents; mitigate, to the extent practicable, harmful effects of security incidents that are known to the covered entity, in violation of 45 CFR 164.308(a)(6)(ii).

241.    Defendant breached its fiduciary duties to Plaintiffs and Class Members by failing to protect against any reasonably-anticipated threats or hazards to the security or integrity of electronic PHI, in violation of 45 CFR 164.306(a)(2).

242.    Defendant breached its fiduciary duties to Plaintiffs and Class Members by failing to protect against any reasonably-anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information, in violation of 45 CFR 164.306(a)(3).

243.    Defendant breached its fiduciary duties to Plaintiffs and Class Members by failing to ensure compliance with the HIPAA security standard rules by its workforce, in violation of 45 CFR 164.306(a)(4).

244.    Defendant breached its fiduciary duties to Plaintiffs and Class Members by impermissibly and improperly using and disclosing PHI that is and remains accessible to unauthorized persons, in violation of 45 CFR 164.502, *et seq*.

245.    As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiffs and Class Members have suffered and will continue to suffer the harms and injuries alleged herein, as well as anxiety, emotional distress, loss of privacy, and other economic and noneconomic losses.

**FOURTH CAUSE OF ACTION**
**BREACH OF CONFIDENCE**
**(On Behalf of Plaintiffs and the Class)**

246.    Plaintiffs restate and reallege all proceeding allegations above as if fully set forth herein.

247. Plaintiffs and Class Members have an interest, both equitable and legal, in the Private Information about them that was conveyed to, collected by, and maintained by Defendant and ultimately stolen in the Data Breach.

248. As a healthcare devices and services provider, Defendant has a special, fiduciary relationship with its customers, including Plaintiffs and Class Members. Because of that special relationship, Defendant was provided with and stored Plaintiffs' and Class Members' Private Information and had a duty to maintain such Private Information in confidence.

249. Customers like Plaintiffs and Class Members have a privacy interest in personal medical and other matters, and Defendant had a duty not to disclose such matters concerning its customers.

250. As a result of the parties' relationship, Defendant had possession and knowledge of highly sensitive and confidential Private Information belonging to Plaintiffs and Class Members, information that was not generally known.

251. Plaintiffs and Class Members did not consent nor authorize Defendant to release or disclose their Private Information to an unknown criminal actor.

252. Defendant breached its duty of confidence owed to Plaintiffs and Class Members by, among other things: (a) mismanaging its systems and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of customer information that resulted in the unauthorized access and theft of Private Information; (b) allowing cybercriminals, including Fog, to steal Plaintiffs' and Class Members' Private Information; (c) mishandling its data security by failing to assess the sufficiency of its safeguards in place to control these risks; (d) failing to design and implement information safeguards to control these risks; (e) failing to adequately test and monitor the effectiveness of the safeguards' key controls, systems,

and procedures; (f) failing to evaluate and adjust its information security program in light of the circumstances alleged herein; (g) failing to detect the Data Breach at the time it began or within a reasonable time thereafter; and (h) failing to follow its own privacy policies and practices published to its customers.

253.    But for Defendant's wrongful breach of its duty of confidence owed to Plaintiffs and Class Members, their Private Information would not have been stolen and would not be at an imminent risk of public release and sale by the ransomware group, Fog.

254.    As a direct and proximate result of Defendant's wrongful breach of its duty of confidence, Plaintiffs and Class Members have suffered and will continue to suffer the injuries alleged herein.

255.    It would be inequitable for Defendant to retain the benefit of controlling and maintaining Plaintiffs' and Class Members' Private Information at the expense of Plaintiffs and Class Members.

256.    Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, and/or disgorgement or restitution, in an amount to be proven at trial.

**FIFTH CAUSE OF ACTION**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiffs and the Class)**

257.    Plaintiffs restate and reallege all proceeding allegations above as if fully set forth herein.

258.    This count is brought in the alternative to Plaintiffs' breach of implied contract count.  If claims for breach of contract are ultimately successful, this count will be dismissed.

259.     Plaintiffs and Class Members conferred a benefit on Defendant by way of customers' paying Defendant to maintain Plaintiffs' and Class Members' Private Information.

260.     The monies paid to Defendant were supposed to be used by Defendant, in part, to pay for the administrative and other costs of providing reasonable data security and protection to Plaintiffs and Class Members.

261.     Defendant failed to provide reasonable security, safeguards, and protections to the personal information of Plaintiffs and Class Members, and as a result Defendant was overpaid.

262.     Under principles of equity and good conscience, Defendant should not be permitted to retain the money because Defendant failed to provide adequate safeguards and security measures to protect Plaintiffs' and Class Members' Private Information that they paid for but did not receive.

263.     Defendant wrongfully accepted and retained these benefits to the detriment of Plaintiffs and Class Members.

264.     Defendant's enrichment at the expense of Plaintiffs and Class Members is and was unjust.

265.     As a result of Defendant's wrongful conduct, as alleged above, Plaintiffs and the Class are entitled to restitution and disgorgement of profits, benefits, and other compensation obtained by Defendant, plus attorneys' fees, costs, and interest thereon.

### SIXTH CAUSE OF ACTION
**DECLARATORY JUDGMENT**
**(On Behalf of Plaintiffs and the Class)**

266.     Plaintiffs restate and reallege all proceeding allegations above as if fully set forth herein.

267. Under the Declaratory Judgment Act, 28 U.S.C. § 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts that are tortious and violate the terms of the federal laws and regulations and state statutes described in this Complaint.

268. Defendant owes a duty of care to Plaintiffs and Class Members, which required it to adequately secure Plaintiffs' and Class Members' Private Information.

269. Defendant still possesses Private Information regarding Plaintiffs and Class Members.

270. Plaintiffs allege that Defendant's data security measures remain inadequate. Furthermore, Plaintiffs continue to suffer injury as a result of the compromise of their Private Information and the risk remains that further compromises of their Private Information will occur in the future.

271. Under its authority pursuant to the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

    a. PRC owes a legal duty to secure its customers' Private Information and to timely notify customers of a data breach under the common law, HIPAA, the FTC Act;

    b. PRC's existing security measures do not comply with its explicit or implicit contractual obligations and duties of care to provide reasonable security procedures and practices that are appropriate to protect customers' Private Information;

    c. PRC continues to breach this legal duty by failing to employ reasonable measures to secure customers' Private Information.

272.     This Court should also issue corresponding prospective injunctive relief requiring PRC to employ adequate security protocols consistent with legal and industry standards to protect customers' Private Information, including the following:

a.  Order Defendant to provide lifetime credit monitoring and identity theft insurance to Plaintiffs and Class Members;

b.  Order that, to comply with Defendant's explicit or implicit contractual obligations and duties of care, PRC must implement and maintain reasonable security measures, including, but not limited to:

    i.  engaging third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on PRC's systems on a periodic basis, and ordering PRC to promptly correct any problems or issues detected by such third-party security auditors;

    ii.  engaging third-party security auditors and internal personnel to run automated security monitoring;

    iii.  auditing, testing, and training its security personnel regarding any new or modified procedures;

    iv.  segmenting its user applications by, among other things, creating firewalls and access controls so that if one area is compromised, hackers cannot gain access to other portions of PRC's systems;

    v.  conducting regular database scanning and security checks;

vi.   routinely and continually conducting internal training and education to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach; and

vii.   meaningfully educating its customers about the threats they face with regard to the security of their Private Information, as well as the steps they should take to protect themselves.

273.   If an injunction is not issued, Plaintiffs will suffer irreparable injury and will lack an adequate legal remedy to prevent another data breach at PRC. The risk of another such breach is real, immediate, and substantial. If another breach at PRC occurs, Plaintiffs will not have an adequate remedy at law because many of the resulting injuries are not readily quantifiable.

274.   The hardship to Plaintiffs if an injunction does not issue exceeds the hardship to PRC if an injunction is issued. Plaintiffs will likely be subjected to substantial, continued identity theft and other related damages if an injunction is not issued. On the other hand, the cost of PRC's compliance with an injunction requiring reasonable prospective data security measures is relatively minimal, and PRC has a pre-existing legal obligation to employ such measures.

275.   Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing a subsequent data breach at PRC, thus preventing future injury to Plaintiffs and other customers whose Private Information would be further compromised and/or stolen.

## SEVENTH CAUSE OF ACTION
## VIOLATION OF THE NORTH CAROLINA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### N.C. Gen. Stat. § 75-1.1
**(On Behalf of Plaintiff Christina Jackson, on behalf of her minor child, J.L., and the North Carolina Subclass)**

276.     Plaintiffs restate and reallege all proceeding allegations above as if fully set forth herein.

277.     Under N.C. Gen. Stat. § 75-1.1, "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are declared unlawful."

278.     Defendant is subject to N.C. Gen. Stat. § 75-1.1, because Defendant engages in commerce in North Carolina. After all, Defendant engages in "business activities" within North Carolina.

279.     Defendant violated N.C. Gen. Stat. § 75-1.1 by, *inter alia*:

   a.   failing to implement and maintain reasonable security and privacy measures to protect Plaintiffs' and Class Members' Private Information, which was a direct and proximate cause of the Data Breach;

   b.   failing to identify foreseeable security and privacy risks, remediate identified security and privacy risks, and adequately improve security and privacy measures following previous cybersecurity incidents, which was a direct and proximate cause of the Data Breach;

   c.   failing to comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, and HIPAA, *et seq.*, which was a direct and proximate cause of the Data Breach;

    d.   omitting, suppressing, and concealing the material fact that it did not reasonably or adequately secure Plaintiffs' and Class Members' Private Information;

    e.   omitting, suppressing, and concealing the material fact that it did not comply with common law and statutory duties pertaining to the security and privacy of Plaintiffs' and Class Members' Private Information, including duties imposed by the FTC Act, 15 U.S.C. § 45, and HIPAA, *et seq.*

280.   Defendant's omissions were material because they were likely to deceive reasonable consumers about the adequacy of Defendant's data security and ability to protect the confidentiality of their Private Information.

281.   Defendant intended to mislead Plaintiffs and Class Members and induce them to rely on its omissions.

282.   Had Defendant disclosed to Plaintiffs and Class Members that its data systems were not secure—and thus vulnerable to attack—Defendant would have been unable to continue in business and it would have been forced to adopt reasonable data security measures and comply with the law. Defendant accepted the Private Information that Plaintiffs and Class Members entrusted to it while keeping the inadequate state of its security controls secret from the public. Accordingly, Plaintiffs and Class Members acted reasonably in relying on Defendant's omissions, the truth of which they could not have discovered through reasonable investigation.

283.   Defendant acted intentionally, knowingly, maliciously, and recklessly disregarded Plaintiffs' and Class Members' rights by failing to disclose its data systems were not secure and, therefore, vulnerable to an attack.

284.   As a direct and proximate result of Defendant's unfair and deceptive acts and practices, Plaintiffs and Class Members have suffered and will continue to suffer injury,

including: (i) theft of their Private Information, (ii) the advertisement of their Private Information for public release and sale by ransomware group, Fog, (iii) remain at an imminent risk of identity theft and fraud, (iv) harm resulting from damaged credit scores and information, (v) loss of time and money obtaining protections against future identity theft, (vi) loss of time and money resolving fraudulent charges, (vii) enrolling in credit monitoring and identity theft protection services, (viii) unreimbursed losses related to fraudulent charges, and (ix) other harm resulting from the unauthorized use or threat of unauthorized use of stolen Private Information, entitling them to damages in an amount to be proven at trial.

285.    And, on information and belief, Plaintiffs' Private Information has already been published—or will be published imminently—on the dark web by ransomware group, Fog.

286.    Plaintiffs and Class Members seek all monetary and non-monetary relief allowed by law.

**EIGHTH CAUSE OF ACTION**
**VIOLATION OF ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT**
**Ill. Comp. Stat. § 505/1, *et seq*.**
**(On Behalf of Plaintiff Cindy Westman, on behalf of her minor child, Z.R., and the Illinois Subclass)**

287.    Plaintiffs restate and reallege all proceeding allegations above as if fully set forth herein.

288.    As fully alleged above, Defendant engaged in unfair and deceptive acts and practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. § 505/1, *et seq.* (the "CFA").

289.    Reasonable individuals would be misled by Defendants' misrepresentations and/or omissions concerning the security of their Private Information because they assume companies,

like Defendant, that collect Private Information from customers will properly safeguard such in a manner consistent with industry standards and practices.

290.    Defendant failed to inform Plaintiffs or Class Members of its inadequate data security practices and procedures that led to the Data Breach, thereby misleading Plaintiffs and Class Members in violation of §505/1 *et seq*. Such misrepresentations and/or omissions were material because Plaintiffs and Class Members entrusted Defendant with their Private Information.

291.    Had Plaintiffs and Class Members known of Defendant's failure to maintain adequate security measures to protect their Private Information, they would not have entrusted their Private Information to Defendant.

292.    Defendant engaged in deceptive and unfair acts and practices, misrepresentations, and the concealment and omission of material facts in connection with the provision of and advertisement of their services in violation of the CFA, including (a) failing to maintain adequate data security to keep Plaintiffs' and Class Members' Private Information from being stolen by cybercriminals and failing to comply with applicable state and federal laws and industry standards pertaining to data security, including the FTC Act and HIPPA; (b) failing to disclose or omitting material facts to Plaintiffs and Class Members regarding Defendant's lack of adequate data security and inability or unwillingness to properly secure and protect the Private Information of Plaintiffs and Class Members; (c) failing to disclose or omitting material facts to Plaintiffs and Class Members about Defendant's failure to comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Private Information of Plaintiffs and Class Members; and (d) failing to take proper action following the Data Breach to enact adequate

privacy and security measures and protect Plaintiffs' and Class Members' Private Information from further unauthorized disclosure, release, data breaches, and theft.

293.     These actions also constitute deceptive and unfair acts or practices because Defendant knew the facts about its inadequate data security and its failure to comply with applicable state and federal laws and industry standards would be unknown and not easily discoverable by Plaintiffs and Class Members and would defeat Plaintiffs' and Class Members' reasonable expectation about the security of their Private Information.

294.     Defendant intended that Plaintiffs and Class Members would rely on its deceptive and unfair acts and practices and the concealment and omission of material facts in connection with Defendant's provision of services.

295.     Defendant's wrongful practices were and are injurious to the public because those practices were part of PRC's generalized course of conduct that applied to Plaintiffs and Class Members. Plaintiffs and Class Members have been adversely affected by Defendant's conduct and the public was and is at risk thereof.

296.     Defendant also violated 815 Ill. Comp. Stat. § 505/2 by failing to immediately notify Plaintiffs and Class Members of the nature and extent of the Data Breach pursuant to the Illinois Personal Information Protection Act, 815 Ill. Comp. Stat. § 530/1. 214. As a result of Defendant's wrongful conduct, Plaintiffs and Class Members were injured in that they never would have provided their Private Information to Defendant had they known or been told that PRC failed to maintain sufficient security to keep their Private Information from being stolen in the Data Breach.

297.     Defendant also violated 815 Ill. Comp. Stat. § 505/2 by failing to inform Plaintiffs and Class Members of the fact that ransomware group, Fog, had exfiltrated Plaintiffs' and Class

Members' Private Information and posted Defendant to its data leak site.

298.    As a direct and proximate result of Defendant's violations of the CFA, Plaintiffs and Class Members have suffered harm, including theft of their Private Information, the advertisement of their Private Information for public release and sale by ransomware group, Fog, an imminent risk of identity theft and fraud, harm resulting from damaged credit scores and information, loss of time and money obtaining protections against future identity theft, loss of time and money resolving fraudulent charges, enrolling in credit monitoring and identity theft protection services, unreimbursed losses related to fraudulent charges, and other harm resulting from the unauthorized use or threat of unauthorized use of stolen Private Information, entitling them to damages in an amount to be proven at trial.

299.    And, on information and belief, Plaintiffs' Private Information has already been published—or will be published imminently—on the dark web by ransomware group, Fog.

300.    Pursuant to 815 Ill. Comp. Stat. § 505/10a(a), Plaintiffs and Class Members seek actual and compensatory damages, injunctive relief, and court costs and attorneys' fees as a result of Defendant's CFA violations.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, pray for relief as follows:

a.    For an order certifying the Class under Federal Rule of Civil Procedure 23 and naming Plaintiffs as the representatives of the Class and Plaintiffs' attorneys as Class Counsel to represent the Class;

b.    For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

      c.        For compensatory, statutory, treble, and/or punitive damages in amounts to be determined by the trier of fact;

      d.        For an order of restitution, disgorgement, and all other forms of equitable monetary relief;

      e.        Declaratory and injunctive relief as described herein;

      f.        Awarding Plaintiffs' reasonable attorneys' fees, costs, and expenses;

      g.        Awarding pre and post-judgment interest on any amounts awarded; and

      h.        Awarding such other and further relief as may be just and proper.

## JURY TRIAL DEMANDED

A jury trial is demanded on all claims so triable.

Dated: December 4, 2024

Respectfully Submitted,

*/s/ Terence R. Coates*
Terence R. Coates (0085579)
**MARKOVITS, STOCK & DEMARCO, LLC**
119 East Court Street, Suite 530
Cincinnati, Ohio 45202
Telephone: (513) 651-3700
Facsimile: (513) 665-0219
tcoates@msdlegal.com

Tyler J. Bean (*pro hac vice* to be filed)
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: tbean@sirillp.com

William B. Federman (admitted *pro hac vice*)
Tanner R. Hilton (admitted *pro hac vice*)
**FEDERMAN & SHERWOOD**
10205 North Pennsylvania Avenue
Oklahoma City, OK 73120
Telephone: (405) 235-1560

wbf@federmanlaw.com

*Counsel for Plaintiffs and the Putative Class*